***TERRY A. DAKE, LTD.***
**11811 North Tatum Boulevard**
**Suite 3031**
**Phoenix, Arizona  85028-1621**
**Telephone: (480) 368-5199**
**Facsimile: (480) 368-5198**
**tdake@cox.net**

**Terry A. Dake - 009656**

Attorney for David A. Birdsell, Trustee of the
 Bankruptcy Estate of Products International Company

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| In re: | ) | In Chapter 11 Proceedings |
| | ) | |
| CARL RAY TWENTIER; | ) | Case No. 2:09-BK-23803-GBN |
| PATRICIA KAY TWENTIER; | ) | |
| | ) | |
| Debtors. | ) | |

**MOTION FOR RELIEF**
**FROM THE AUTOMATIC STAY**

David A. Birdsell ("Birdsell"), as the trustee of the bankruptcy estate of Products International Company, Case No. 2:08-BK-01454-SSC, moves this Court for relief from the automatic stay.  This motion is more fully set forth in and is supported by the following Memorandum Of Points and Authorities.

DATED April 1, 2010.

***TERRY A. DAKE, LTD.***

By___/s/ TD009656_____
      Terry A. Dake – 009656
      11811 North Tatum Boulevard
      Suite 3031
      Phoenix, Arizona 85028-1621
      Attorney for Trustee

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Products International Company ("PIC") is an Arizona corporation owned by the debtors and by Michael Ferring. PIC has been a debtor in its own Chapter 11 proceeding since February 15, 2008. Birdsell is the trustee of the PIC bankruptcy estate.

Although reorganization plans were filed in the PIC bankruptcy both by the trustee and by a creditor, the Court denied confirmation of both plans and directed the trustee to seek a buyer for the business. The trustee did so and a motion to approve a sale has been filed in the PIC case. A copy of the pending sale contract is attached.

The sale motion affects two assets involved in this bankruptcy estate. First, Carl Twentier claims to be the owner of a patent which may be utilized in the operation of PIC's business. Birdsell disputes Mr. Twentier's asserted ownership interest in that asset. Birdsell contends that PIC is the rightful owner of the patent and that title to the patent was simply placed in Mr. Twentier's name even though all expenses related to the patent have been paid for by PIC and even though the patent is carried as an asset on PIC's balance sheet. Accordingly, as part of the sale motion, Birdsell seeks to sell the patent free and clear of any further right, title or interest of the Twentiers. Their alleged ownership claims will attach to the sale proceeds and the ownership dispute, and the value of the patent, will be litigated and/or resolved subsequently.

Second, the debtors are the owners of certain real property which is currently occupied by PIC. PIC currently pays the mortgage for the property along with taxes, insurance and maintenance. The sale

motion would continue that arrangement for at least six months, and PIC will sublease the property to the buyer of PIC's assets.

The motion also request certain personal relief with respect to the Twentiers.  The buyer has required that the shareholders of the debtor execute a confidentiality agreement to protect the viability of the business that is being sold.   As part of the sale motion, Birdsell will request the PIC Court to impose the terms of the confidentiality agreement on the Twentiers unless they voluntarily sign the agreement presented or one that is acceptable to the buyer.

So that the PIC sale can proceed, Birdsell requests that the automatic stay be modified to permit Birdsell to proceed with the proposed sale including the sale free and clear of the patent, the extension of the lease of the property, and either a voluntary or involuntary non-disclosure agreement binding the debtors.   Without this relief, Birdsell will be unable to proceed with a sale of the business as directed by the Court in the PIC case.

**WHEREFORE**, Birdsell prays for the entry of an order modifying the automatic stay to permit the sale motion to proceed as set forth herein.

DATED April 1, 2010.

*TERRY A. DAKE, LTD.*

By /s/ TD009656
    Terry A. Dake
    11811 North Tatum Boulevard
    Suite 3031
    Phoenix, Arizona 85028-1621

3

```
1   Copy e-mailed April 1, 2010 to:

2
    HAROLD CAMPBELL
3   CAMPBELL & COOMBS, P.C.
    1811 S. ALMA SCHOOL ROAD
4   SUITE 225
    MESA, AZ 85210
5   480-839-4828
    Fax : 480-897-1461
6   Email: heciii@haroldcampbell.com

7    /s/ TD009656

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          4
```

# PURCHASE CONTRACT & RECEIPT

SELLER:     Products International Company, DBA TabBand, By David Birdsell, Trustee

BUYER:      Delk Holdings, Inc. or assigns

## WITNESSETH

WHEREAS, SELLER is an Arizona corporation that operates a business under its corporate name Products International Company, and does business as TabBand (the "Company"); and

WHEREAS, Company is in the business of the manufacture and sale of plastic identification bands for use in hospitals, veterinary clinics, or other commercial uses (referred to herein as the "Company's Business"); and

WHEREAS, SELLER and BUYER desire to set forth herein the terms and conditions of SELLER'S SALE TO BUYER of the business Assets of the Company as more fully described below. This agreement will be referred to as the "Contract" or "Agreement").

## AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing recitals and of the terms and conditions hereinafter set forth, the parties do hereby mutually agree as follows:

1.      <u>PURCHASE AND SALE</u>.  SELLER hereby agrees to sell, convey, transfer, assign and deliver to BUYER, and BUYER agrees to purchase from SELLER, the following described assets of the Company (collectively referred to herein as the "Assets"):

> a.      All right, title and interest, in and to the furniture (exclusive of furniture that is the personal property of Carl Twentier), trade fixtures, furnishings, machinery, equipment, computer equipment, , and any other personal property  used in connection with the Company's Business, including without limitation those items described on Exhibit "A" attached hereto and incorporated herein by reference;

> b.      All right, title and interest, in and to the inventory, supplies, packaging, materials, and goodwill associated with the Company and/or Company's Business, and all transferable rights, in and to all telephone numbers, cell phone numbers provided to customers, distributors or suppliers, facsimile numbers, and voice and data lines and numbers associated with the Company and/or Company's Business;

> c.      All right, title and interest, in and to all licenses, permits, and exclusive of any liability for SELLER'S acts prior to Closing, contracts to provide products or services to any third parties, contracts rights, agreements and approvals to transact business with or for certain businesses or industries, and all Company's rights in or to leases of equipment of any kind used in connection with the Company and/or Company's Business;

d.      All right, title and interest, in and to any and all patents and/or rights to patents granted or pending, in the United States and internationally, owned or held by the Company, or any of its owners, employees, officers, directors or representatives if used or related in any way to the Company or Company's Business as well as any international patents, including without limitation, the Patent #6,546,656B2, Issued April 15, 2003 under the name of Carl Twentier and/or Patricia Twentier;

e.      All right, title and interest, in and to any and all designs, concepts, ideas, inventions, art, logos, trade marks, and trade names owned and/or utilized in the business of the Company, together with all trademarks, rights of trademark, applications for trademark (pending or otherwise) and all other right, title, or interest to such names, including without limitation the names "TabBand", "Stat!", "TabBand Max", "Shield", "Imprint", "Quick Pass" and "Products International Company".

f.      All right, title and interest in and to the web site(s), design(s) for web sites; internet domain names, internet connections, service provider contracts or internet identification of any kind, and all marketing or advertising concepts, designs or plans, related in any way to the Company, including without limitation, the website "www.tabband.com"; and

g.      All right, title and interest, in and to the data, database, software, software licenses, customer files, contract rights, brochures, business plans, accounting and payroll records, employee contracts, employee lists, employee files, customer lists, accounts receivable, promissory notes receivable, sales records, or other information owned or held by the Company or utilized in the business of or related in any way to the Company;

2.      <u>PURCHASE PRICE</u>.  The price to be paid by BUYER to SELLER for the Assets of the Company will be $1,100,000, PAYABLE AS FOLLOWS:

$50,000.00 Earnest money paid by BUYER in the form of a cashier's check (the "Earnest Deposit" or "Earnest Money").

$1,050,000.00 Cash payable by cashier's check made payable to and to be deposited with Trustee at the Close of Escrow (as hereinafter defined).

3.      <u>EARNEST MONEY</u>.  The Earnest Deposit shall accompany the submission of the Purchase Contract and Receipt and the Earnest Money be held by the Trustee until the Bidder wishes to withdraw from the sale process. All Earnest Money will be fully refundable until such time as a Final Purchase Contract is signed by BUYER and SELLER and accepted by the bankruptcy court. BUYER'S Earnest Deposit will be fully refundable if this offer is not accepted by the bankruptcy court.  The Earnest Money shall be cashed, held in an interest-bearing account (the interest on which shall be added to the Earnest Money), and applied by the Trustee in accordance with the terms, conditions and provisions of this Agreement.  In the event this Contract does not close, then the disposition of the Earnest Money shall be governed by the terms of this Contract dealing with termination and remedies.  Notwithstanding any other provisions of this Agreement, upon default by SELLER or BUYER under the terms of this Agreement, if SELLER or BUYER, as applicable, shall fail or refuse upon demand to send written instructions to the Trustee to immediately deliver the

Earnest Money to the non-defaulting party, then the non-defaulting party shall, in addition to receiving the Earnest Money, have the right to exercise any and all remedies provided at law or in equity under applicable law.

4.     BILL OF SALE.  At Close of Escrow, Trustee shall deliver title to the Assets to BUYER by bill of sale, whereby all assets shall be transferred free and clear of any liens, security interests, claims and encumbrances whatsoever.

5.     CLOSE OF ESCROW.  Closing of this transaction shall occur within 15 business days of the Bankruptcy Court's acceptance of the final bid ("Close of Escrow" or "Closing Date") unless mutually extended in writing by the parties hereto.  At the Close of Escrow, Trustee shall transfer possession of the Company's premises and Assets to BUYER and the Close of Escrow will be the date of proration of rent, assessments, insurance (if assumed by BUYER), utility charges (if carried over to BUYER), and other charges, fees, or prepaid expenses pertaining to the Company premises, the Assets being purchased hereunder, or the business operations of the Company.  Specifically the Parties will perform at the Close of Escrow as follows:

    a.     SELLER shall:

        i.     Execute and deliver a Bill of Sale and Assignment as to all of the Assets specified in this Agreement; and

        ii.    Assignment of Patent, and all related patents owned or controlled by SELLER, if any; and

        iii.   Execute and deliver all such other documents and instruments as are required, necessary or appropriate to the consummation of this transaction.

    b.     BUYER shall:

        i.     Pay to SELLER the cash portion of the purchase price for the Assets as specified above, less the Earnest Deposit to be applied to the Purchase Price due at Closing;

        ii.    Execute and deliver such other documents and instruments as are required, necessary or appropriate to the consummation of this transaction; and

        iii.   Take possession of the Assets and leased premises to be delivered to BUYER as of the Closing Date.

    c.     List of Customers.  SELLERS shall acknowledge the accuracy and completeness of the List of Customers to be provided at Closing, and any other exhibits to be acknowledged or provided by SELLER as set forth in this Agreement.

d.    Notice to Utility Service Providers.  At BUYER'S request, SELLER shall produce written notice to be provided after Closing that billings for all utility service providers should be changed into the name of BUYER as soon as possible after Closing, but that no interruption in service shall occur.  Any deposits held by the utility service providers on behalf of SELLERS will accrue to BUYER'S benefit and no amount will be refunded to SELLER in connection with the changing of the party responsible for such utilities.

e.    Notice to Customers and/or Suppliers.  At BUYER'S request, SELLER will provide a letter acceptable to BUYER providing notice of the transfer of control of the Company's Business to BUYER and encourage the customers to remain loyal to the new owner and the continuation of the Company's Business under BUYER'S name.

f.    Assignment of Confidentiality Agreement.   SELLER will also assign or cause Fox & Fin Financial to assign to BUYER all right title and interest in and to the Confidentiality Agreement entered into with each of the bidders or those receiving Confidential Information in connection with the bid process and the "Medical Identification Band Company".

g.    Court Orders.  SELLER will cause to be provided at Closing, a Court Order in form satisfactory to BUYER, in BUYER's sole discretion, that i) assigns all rights, title and interest in and to the Patent and the Assets to BUYER; ii) fully transfers the rights, title and interest of Company, Carl Twentier, Patricia Twentier and Mike Ferring, if any, in and to the Patent and the Assets upon transfer to BUYER and by Order of the Court; iii) imposes and/or ratifies the terms and enforceability of the Confidentiality and Nondisclosure Agreement upon Carl Twentier, Patricia Twentier and Mike Ferring in accord with the terms described in this Agreement; iii) imposes and/or ratifies the terms and enforceability against Company, Carl Twentier, Patricia Twentier and Mike Ferring, of a prohibition of the solicitation of Company's customers for the purpose of doing business in relation to products the same as or similar to those sold as part of Company's Business.

6.    PRORATION.  BUYER and SELLER hereby agree to prorate to the date of possession their proportionate share of the current month's monthly rental for the Company premises, utility bills, insurance premiums and the current year's real estate property taxes to the extent appropriate for the lease term entered into between BUYER and the landlord for the leased premises.  All work in process and accrued profits shall be prorated on a percentage of completion basis mutually acceptable to BUYER and SELLER, and at such time as BUYER successfully collects from the SELLER the amounts due, BUYER will forward the prorated amount due to SELLER upon collection of said amounts on completed orders initiated by SELLER before Closing.

7.    WARRANTY AGAINST LIABILITIES. BUYER will receive possession of the Assets of the Company free and clear of any liabilities, claims, or encumbrances, including but not limited to any sales, withholding, payroll, or other taxes.

8.   INDEMNIFICATION OF BUYER. Except as otherwise expressly provided in this Agreement, BUYER does not purchase or assume any liabilities or obligations of SELLER or the Company whether arising in the past, present or future.  Accordingly, the parties hereto covenant and agree that except for liabilities expressly assumed by BUYER, to the extent any claim is covered by insurance policies of any kind for the benefit of Company, its directors or officers, Company, hereby indemnifies, defends and holds harmless BUYER and BUYER'S Shareholders, Members, Partners, general and limited, and their directors, managers, officers, agents, employees, representatives and assigns (collectively referred to in this paragraph as "BUYER") from and against any and all claims, debts, demands, liabilities, suits, losses, costs, expenses, judgments and damages, including without limitation any expense of investigation, legal representation and other expenses incurred in connection with and/or any amount paid in settlement of any claim, debt, demand, action, cause of action, suit, or proceeding, to which BUYER may become subject as a result of acts, omissions, or transactions of the Company prior to Closing or as a result of the direct or indirect conduct of the Company or its employees or representatives  arising before the Closing Date.  ***This indemnification will apply regardless of whether any such claim involves BUYER'S alleged or actual negligence, sole, contributory or otherwise, except to the extent BUYER fails to provide reasonable notice to SELLER  of an indemnified claim after  BUYER receives notice.***

Notwithstanding anything contained in this Agreement, the terms and provisions of this Article 8. will survive the Closing.

9.   INVENTORY OF GOODS.  The parties agree that at Close of Escrow SELLER'S inventory of current, saleable raw material and current, saleable finished goods, at SELLER'S cost, measured by manufacturers' published price for such materials verified by SELLER'S records, will be approximately $341,000. Immediately prior to Close of Escrow, SELLER and BUYER shall prepare an itemized and detailed physical inventory of such goods.  Any difference between the actual cost of the  current, saleable raw material and finished goods as determined by the detailed inventory and the foregoing estimated cost of $341,000 shall be reflected in an adjustment upward or downward of the total Purchase Price herein, which adjustment shall be reflected in the amount of cash due at the Close of Escrow.

The parties acknowledge and agree that to be counted as part of the "current, saleable raw materials and current saleable finished goods" the inventory must meet the following criterion:

i)   The inventory items cannot be "Dead Inventory" meaning there have been no sales or transfers of such items during the previous 12 months, unless: a) the item in question is a critical repair part; or b) the item is a new stock item that a customer has committed to buy or a salesperson has committed to sell to a particular customer.

ii)   The inventory items cannot be "Slow Moving Inventory" meaning such items have not experienced significant customer demand during the previous 12 months, unless: a) there is reasonable expectation that customer demand for the item will increase during the next 12 months; b)customers have a reasonable expectation that the Company will always have the item on the shelf and available for immediate delivery; or c) there is not another source for this item that will allow Company to meet Company's customers' expectations without maintaining warehouse inventory at the Company.

10.    SELLER'S REPRESENTATIONS AND WARRANTIES.  To induce BUYER to enter into this Agreement and to purchase the Assets, SELLER and the Company represent, warrant, and covenant to BUYER as follows:

10.01    Authority.  SELLER has all requisite power and authority to own the Assets for purposes of this sale, and has duly authorized the execution and delivery of this Agreement.  The execution and delivery of, and SELLER'S performance under, this Agreement is within SELLER'S powers, has been duly authorized and sufficient authority shall be provided at Closing. This Agreement constitutes a legal, valid and binding obligation upon SELLER and the Company, enforceable in accordance with its terms.  Performance of this Agreement will not result in any material breach of, or constitute any material default or material violation of, any will, trust, promissory note, deed of trust, contract for sale, agreement, order, judgment, laws, or other obligation to which SELLER or Company are a party or by which SELLER or the Company might be bound which may adversely affect in a material manner the transfer of Assets under this Agreement.

10.02    Liens.  As of Closing all liens or security interests will be released in full against the Assets.  Other than claims released through this Bankruptcy proceeding, there is no threatened litigation or administrative proceedings which could adversely affect title to the Assets or any part thereof or the ability of SELLER to perform any of its obligations hereunder or the sale of Assets by BUYER in the ordinary course of business, or otherwise adversely affect the Assets in any way.  For purposes of this Agreement, SELLER'S knowledge means the best knowledge of Company, as well as any officers, managers or representatives of Company.

10.03    Taxes.  Except for those personal property taxes for the current year not yet due, all federal, state, local and foreign income, ad valorem, excise, sales, use, payroll, unemployment and all other taxes and assessments against SELLER or Company have been paid, will be resolved in Bankruptcy or deemed paid in full, in connection with the Assets to be sold to BUYER under this Agreement.  There are no unpaid taxes to SELLER or Company's knowledge that are or could become a lien on the Assets or require payment, except for current year taxes not yet due and payable.

10.04    Organization.  Company is validly existing and in good standing under the laws of the State of Arizona and is qualified to do business in all relevant jurisdictions in which it currently does business.

10.05    Ownership of Company.  Carl Twentier, Patricia Twentier, and Mike Ferring are the lawful owners and holders of outstanding Stock ownership in the Company, and there are no other owners or holders of any ownership interest, lien, pledge or hypothecation in or of the Company or the Assets.

10.06    Equipment Operational.  SELLER and Company hereby represent and warrant that all equipment is in good working order as of the date of Closing., except one of the three production machines which BUYER acknowledges is not operational.

10.07   Viability of Product.   SELLER and Company hereby represent and warrant that they are not aware of any customer dissatisfaction with or obsolescence of any TabBand product(s) that materially damages the competitiveness or viability of any TabBand product(s) in the market place.

10.08   Full Disclosure.  To the best of SELLER'S knowledge, no representation, warranty or covenant made to BUYER in this Agreement nor any document, certificate, exhibit or other information given or delivered to BUYER pursuant to this Agreement contains or will contain any untrue statement of a material fact.

The representations, warranties and covenants of SELLER and the Company set forth in Sections 10.01 through 10.08 above shall be deemed to be restated and reaffirmed by SELLER at Closing and shall survive the Closing hereof.

11.   CONDITION OF EQUIPMENT.   BUYER represents that together with SELLER'S representations and warranties provided in this Agreement in relation to the Equipment, BUYER acknowledges having inspected, or having had a reasonable opportunity to inspect, all of the Assets being sold hereunder, including but not limited to all equipment and fixtures; and BUYER accepts and purchases such Assets on an "as is" basis without warranty from SELLER of merchantability or fitness for any particular purpose.

12.   RISK OF LOSS OR DAMAGE.  All risk or loss of damage to the Assets being sold herein or to the Company's premises shall, if occurring prior to Close of Escrow, shall be SELLER'S responsibility; and BUYER shall assume all such risk of loss or damage following Close of Escrow.

13.   COMPANY RECORDS.  At Close of Escrow, SELLER shall deliver to BUYER copies of all customer accounts and records and other documents pertinent to the operation of the Company. Such records shall include copies of any documents necessary to enable BUYER to conduct the Company's business with its suppliers and customers.

14.   FINANCIAL STATEMENTS AND INFORMATION.

A.   BUYER acknowledges having previously received financial information for the periods from 10/1/2005 through 2/28/2010.  SELLER warrants and represents that all information contained on such financial information is true and correct as of the dates shown and fairly and accurately represents the results of the operations of the Company during those periods.  SELLER shall provide any organizational chart of employees currently utilized by Company showing duties and work schedule.  SELLER shall further provide any personnel manual utilized by Company. Finally, SELLER shall provide payroll records for the year 2002 through the date of Closing.  The foregoing items should be furnished to BUYER prior to Closing if not already provided as of the date of this Agreement.

B.   The parties understand and acknowledge that any financial information furnished or to be furnished by BROKER to SELLER or BUYER was originally provided to BROKER by the party to whom the information pertains.  BROKER has conducted no independent investigation whatsoever of the Company or the information supplied by SELLER nor has BROKER investigated the financial condition or business acumen of BUYER or the information supplied by BUYER, nor

does BROKER warrant or represent the accuracy of any of the information contained herein.

15.    SELLER'S COVENANTS. SELLER covenants to BUYER that from and after the receipted date of this Agreement by Fox & Fin until the Closing date, SELLER will:

   15.01   Business Operations. Operate Company's business and conduct its activities in the normal course of business and use commercially reasonable efforts to preserve intact and maintain goodwill with Company's present customers, Company's suppliers or vendors, and SELLER'S employees and otherwise continue operating the business in a good and workmanlike manner and a manner consistent with its historical operating procedures.

   15.02   No Sale or Pledge of Liens or Assets. SELLER shall not sell, pledge, hypothecate, lease, encumber, dispose of or agree to do any of these acts, regarding any of the Assets, other than as part of sales or purchases in the normal course of business, without prior written approval of BUYER.

   15.03   Maintenance of Assets. SELLER shall maintain that portion of the Assets which constitutes the inventory, in a merchantable condition and maintain the Assets other than the inventory in a good state of repair and operating condition, except for ordinary wear and tear.

   15.04   Maintenance of Insurance. SELLER shall keep in force all policies of insurance covering Company and the Assets.

   15.05   Permits and Certificates. SELLER shall have in place current permits, licenses or other certificates, which may be required of SELLER to operate the Company, and to the extent permitted by law or by written agreement, such permits, licenses or certificates shall be assigned to SELLER upon the date of Closing.

16.    CONDITIONS TO BUYER'S OBLIGATIONS. The following shall be conditions precedent and contingencies to BUYER'S obligations hereunder:

   16.01   No Breach or Termination. That SELLER has not breached this Agreement and the Agreement has not been timely terminated pursuant to any termination provisions.

   16.02   Truth of Representations and Warranties. On the Closing Date, all of SELLER'S representations and warranties shall be materially true and correct, and SELLER shall have performed each covenant to have been materially performed by SELLER hereunder within the time specified.

   16.03   No Adverse Changes. On the Closing Date, there shall be no adverse material change in the matters reflected in the financial records provided in connection with the sale of Assets.

   16.04   Lease. SELLER will have provided prior to the date of the hearing in which this Agreement is presented to the Court for approval, one of the following: i) a Lease for the benefit of BUYER, contingent only upon Closing of this Contract, that leases the two primary existing Company leased premises located at 2320 West Holly Street (the "Leased Premises"), to BUYER on a month to month term that may not be terminated by Landlord during the first six months except on

90 days written notice, at a rental rate that is the same as the historic rent paid by the Company, payable to landlord's lender, Desert Hills Bank, that holds a lien against the Leased Premises, and such Lease otherwise contains reasonable terms acceptable to BUYER; or ii) a Sublease for the benefit of BUYER, prepared and presented by BUYER and approved as to form by SELLER prior to the date of the hearing wherein the Sublease is submitted for approval by the Court, contingent upon Closing of this Contract, that subleases the Leased Premises from SELLER on a month to month term that may not be terminated by Sublessor or Landlord during the first six months except on 90 days written notice, at a rental rate that is the same as the historic rent paid by the Sublessor, plus $100 per month, and such Sublease otherwise contains reasonable terms acceptable to BUYER. In either event, BUYER acknowledges it will be responsible for payment of taxes and insurance prorated for the duration of BUYER's occupancy of the Leased Premises as a tenant. Any Sublease arrangement will require that Sublessor has in place a leasehold interest with at least a similar if not greater term than that leased to BUYER.

16.05    Nondisclosure.  SELLER will use its best efforts to provide prior to the date this Agreement is presented to the Court for approval, a Confidentiality and Nondisclosure agreement in form substantially similar to Exhibit "B" attached hereto and incorporated herein by reference, fully executed by Carl Twentier, Patricia Twentier, and Mike Ferring for the benefit of BUYER.

16.06.    Release of Patent and Nondisclosure Agreements.    SELLER will use its best effort to provide from Carl Twentier, Patricia Twentier and Mike Ferring, prior to the date of the hearing wherein this Agreement is presented to the Court for approval, i) a Release of all right title and interest in and to the Patent; and ii) an agreement that prohibits Company, Carl Twentier, Patricia Twentier and Mike Ferring from the solicitation of Company's customers for the purpose of doing business in relation to products the same as or similar to those sold as part of Company's Business.

If any of the above conditions of this Section 16. is not satisfied as of the date of Closing or by such earlier date if required by the terms stated above, SELLER will be deemed to have committed a material breach of this Agreement, and BUYER may pursue any available remedy in the event of a material breach, including without limitation, termination of this Agreement and withdrawal of all Earnest Money paid hereunder or specific performance, but such will not constitute an election or waiver of any other remedies that may be available to BUYER at law or in equity.

17.    LIMITATION  OF  REPRESENTATIONS  AND  WARRANTIES.    Subject to the representations, warranties and covenants of this Agreement, BUYER acknowledges having personally investigated to his full satisfaction, or having had reasonable opportunity to investigate, all aspects of the Company and the Assets being sold hereunder, including but not limited to the Company premises; all utility services and systems available to said premises and all improvements and fixtures situated thereon; all equipment, tools, inventory, parts, appliances, and other tangible Assets included in this sale, any underlying encumbrances or applicable lease, options, licenses, uses, variances, permits, covenants and/or restrictions pertaining to Company premises or any of the Assets included in this sale; and any other items or intangible rights included in this sale.  BUYER acknowledges having thoroughly reviewed to his satisfaction, or having had reasonable opportunity to review, all of SELLER'S financial records pertaining to the operation of the Company and its business; and in addition to reliance on SELLER'S representations and warranties in this Agreement, BUYER acknowledges having finally relied upon his own personal judgment and decision in entering into and consummating this purchase and sale.  BUYER is satisfied that he

personally has the financial resources and business acumen to successfully operate the Company. BUYER understands that future profits from the operation of the Company are dependant upon many factors and are in no way guaranteed by SELLER. No representations, promises, or agreements have been made between the parties hereto except as expressly set forth herein; and neither BUYER, SELLER, Trustee nor BROKER shall be entitled to rely on, nor shall they be bound by, any alleged understandings, agreements, promises, representations, or covenants which are not specifically set forth herein. The limitations set forth in this section shall survive the close of escrow or the cancellation of this Agreement.

18.    REMEDIES.

The following provisions shall govern the rights and remedies of SELLER and BUYER relative to the termination of, or a default under, this Agreement:

     a.    In the event BUYER or SELLER defaults or fails in performing any of their respective obligations under the terms of this Agreement for any reason, the other party will be entitled to pursue all available legal and equitable remedies, including injunctive relief and specific performance.

     b.    In the event of any legal proceeding arising out of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees.

19.    POST CLOSING OBLIGATIONS.

19.01    Usage of Name.    SELLER and the Company, individually, agree that after the Closing Date, they will not use or employ in any manner, either directly or indirectly, the trade names of SELLER ("Products International Company" or "TabBand") or any variation of the name.

19.02    Confidential Information.    After the Closing Date, SELLER and the Company, as well as Carl Twentier, Patricia Twentier, and/or Mike Ferring shall not disclose, without prior written consent of BUYER, any information, document or fact pertaining to Company which is learned in the course of their dealings with the Company. SELLER and the Company, individually, agree to refrain from distributing, copying, disclosing or disseminating in any form the confidential information of the Company to any person or entity except with BUYER'S prior written consent. Confidential Information shall include all information relating to the products, contracts and customers of Company as well as the sale, purchase, distribution and marketing of Company's products. All Confidential Information of Company shall remain the property of BUYER.

20.    NOTICES.    All notices required or permitted to be given hereunder shall be in writing and either delivered or sent certified mail, return receipt requested, postage prepaid, to the parties at the following addresses:

       SELLER:    _____

                 _____

                 _____

BUYER:          Delk Holdings, Inc.
                        4040 Grassmere Lane
                        Dallas, Texas 75205

        COPY TO:        Kenneth W. Sloan
                        5950 Berkshire Lane, Ste. 450
                        Dallas, Texas 75225

The parties reserve the right from time to time to designate additional addresses or recipients of such notices. All notices sent by certified mail shall be deemed received five days after posting.

21.     <u>CONTINGENCIES:</u>  This offer is contingent upon:

        a.      Approval of the Bankruptcy court in not more than thirty (30) days from the date of Buyer's execution of this Agreement;

        b.      The contingencies stated in this Agreement.

22.     <u>MISCELLANEOUS PROVISIONS.</u>

        a.      This Purchase Contract and Receipt constitutes the complete and entire Agreement between the parties and completely merges and supersedes all prior and contemporaneous oral and written discussions, negotiations and agreements. No additions or modifications to or deletions from this Agreement shall be effective unless executed by the parties hereto in writing. This Agreement shall be construed pursuant to the laws of the State of Arizona. Time is of the essence hereof.

        b.      This Purchase Contract and Receipt shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors, and assigns forever.

        c.      In the event any of the provisions of the Purchase Contract and Receipt are held to be unenforceable or invalid by any court of competent jurisdiction, the validity and enforcement of the remaining provisions or portions thereof shall not be affected thereby, and such remaining provisions shall remain in full force and effect.

        d.      The various headings of the Purchase Contract and Receipt are inserted for convenience or reference only and shall have no effect on the meaning or interpretation of this Purchase Contract and Receipt or any of its provisions. It is further advised by BROKER should any portion or clause of the Contract not be understood by SELLER and/or BUYER that their respective Attorneys and/or Accountants be consulted.

        e.      Any costs or charges incurred by the parties hereto to attorneys, accountants, or other professional advisors in connection with the preparation and execution of this Purchase Contract and Receipt and the closing of this transaction (but not charges associated with the enforcement rights hereunder, which shall be governed by subparagraph (B) above) shall be borne by the party incurring same.

f.      Each party agrees in good faith to execute such further or additional documents as may be necessary or appropriate to fully carry out the intent and purposes of this Agreement.

g.      This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall constitute one and the same instrument. A fully-executed facsimile copy of this Agreement shall be treated as an original.

[Remainder of page Intentionally Left Blank]

IN WITNESS WHEREOF the parties hereto have set their hands on the date and year set forth below.

EXECUTED BY SELLER this _31_ $^{ST}$ day of _March_ , 2010

**Products International Company**

By: _____ David Birdsell, Trustee

EXECUTED BY BUYER this _31_ $^{ST}$ day of _MARCH_ , 2010.

**Delk Holdings, Inc.**

By: Robert E. Delk
Its: President

EXECUTED BY BROKER this _31_ day of _MARCH_ , 2010.

**Fox & Fin Financial Group, L.C.**

By: Jim Afinowich
Its: Designated Broker

PURCHASE CONTRACT & RECEIPT
PAGE 12

<h1 style="text-align:center">EXHIBIT "A"</h1>

## Manufacturing Equipment

| | |
|---|---|
| 3 | Custom-built band machines |
| 1 | Auto feed shrink-wrap tunnel and sealer |
| 1 | Splint cutter |
| 1. | Splint roller |
| 1 | Electric Shipping Tape Dispenser |
| All | Compressors |
| All | Hand Dollies |
| 1 | Forklift |
| All | Pallet Jacks |
| All | Tools |
| All | Conveyors |
| All | Roll Carrier Dolly |
| All | Racking for Finished Product |
| All | Production Aids including Tables on Rollers |
| All | Step Ladders |

## Office Equipment

| | |
|---|---|
| 1 | Computer server and monitor |
| 6 | Desktop computers and monitors |
| 7 | Uninterruptable Power Supplies |
| 1 | Fax machine |
| 1 | Copier |
| 1 | Xerox color printer |
| 1 | Epson Stylus color printer |
| 1 | HP color printer |
| 2 | HP black and white printers |
| 2 | HP Scanjets |
| 1 | Nortel phone switch |
| 8 | Desktop phones |
| All | File Cabinets |
| All | Shelving |

## Office Furniture

| | |
|---|---|
| 4 | Executive desks, wood |
| 6 | Desks, metal |
| 6 | Desk chairs |
| | Credenzas |
| | File cabinets |
| | Folding tables |

# EXHIBIT "B"

**(See Attached Confidentiality, Non-Disclosure And Non-Solicitation Agreement)**

# CONFIDENTIALITY, NON-DISCLOSURE AND NON-SOLICITATION AGREEMENT

In connection with the anticipated sale of assets of Products International Company, doing business as TabBand (the "Company" or the "Disclosing Party") to Delk Holdings, Inc. (referred to herein as "Delk"), the Company will be disclosing certain Proprietary Information (as defined below) through certain owners or employees of the Disclosing Party. For purposes of this Agreement those persons facilitating disclosure will be referred to herein as the "Constrained Parties" in that they will commit not to disclose or utilize the Proprietary Information and such covenant will be made for the benefit of and enforceable by the Company and Delk Holdings, Inc. This Agreement will be assigned to Delk Holdings, Inc. upon closing on the sale of assets to Delk. The Constrained Parties who have agreed to execute this Agreement are Carl Twentier, Patricia Twentier, and Mike Ferring (who will be referred to individually and jointly as the "Constrained Party"). This Confidentiality, Nondisclosure and Non-Solicitation Agreement ("Agreement") governs the relationship between the parties with respect to the disclosure of confidential information. The Constrained Party agrees to make no other use of such Proprietary Information or any portion thereof for any purpose other than as expressly set forth herein. As between the parties, all Proprietary Information will be and will remain the sole property of Disclosing Party, subject to assignment to Delk.

In consideration of any disclosure and any negotiations concerning the existing or contemplated business relationship between the parties and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.      For the purposes of this Agreement, "Proprietary Information" shall mean information, whether or not originated by Disclosing Party, and whether or not reduced to writing, which is used in Disclosing Party's business and is: (i) proprietary to, about or created by or for Disclosing Party or any of Disclosing Party's clients, customers, licensors or suppliers; (ii) gives Disclosing Party some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of Disclosing Party; (iii) designated as Proprietary Information by Disclosing Party, or from all the relevant circumstances should reasonably be assumed by Constrained Party to be confidential and proprietary to Disclosing Party; or (iv) not generally known by non-Disclosing Party personnel. In addition, the following types of information and other information of a similar nature (whether or not reduced to writing or designated as confidential) shall be deemed to be Proprietary Information:

        a.      *Confidential Business Information.* Internal Disclosing Party materials, trade secrets, processes, ideas, strategies, data, designs, and any analyses, compilations, studies, summaries, extracts or other documentation prepared from the confidential business information;

        b.      *Business Operations.* Internal Disclosing Party personnel and financial information, vendor names and other vendor information (including vendor characteristics, services and agreements), purchasing and internal cost information, internal services and operational manuals, tax returns and the manner and methods of conducting Disclosing Party's business;

        c.      *Marketing and Development Operations.* Marketing and development plans, specific and general marketing materials, advertising information and materials, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques and

methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of Disclosing Party which have been or are being discussed;

d. *Customers*. Names of customers and their representatives, contracts and their contents and parties, customer services, data provided by customers and the type, quantity and specifications of products and services purchased, leased, licensed or received by clients of Disclosing Party; and

e. *Technology*. Algorithms, concepts, designs, devices, discoveries, documentation, firmware, formulae, ideas, inventions, hardware, know-how, layouts, manuals, manufactures, methods, patterns, principles, procedures, show-how, software and computer programs (in executable, object, source and any other form), systems and techniques, in each case of any nature whatsoever and whether or not copyrightable, fixed in tangible form, patentable or reduced to practice.

2.     Constrained Party will use the Proprietary Information solely for the purpose of performing within the scope of Constrained Party's employment or relationship to Company to consult for the purposes of providing Proprietary Information to assist Delk in analyzing the Company and its business in the contemplated sale transaction and evaluating a possible transaction,  as applicable, and not for any other purpose, including, but not limited to, its own individual purposes, internal purposes, competitive purposes, or to hire or engage in business with any of Company's employees or Company's customers and not to harm, injure, compete against or use in any other way detrimental or adverse to the Disclosing Party. Constrained Party will treat the Proprietary Information with the same degree of care with which Disclosing Party and its assignee treats its own confidential and proprietary information of high importance, but in no event less than with a reasonable degree of care. Constrained Party shall not directly or indirectly disclose, display, provide, transfer, or otherwise make available all or any part of the Proprietary Information to any third party at any time during the period in which Constrained Party has access to the Proprietary Information or thereafter, unless Constrained Party has received prior written permission from Disclosing Party.  Constrained Party shall not make copies of the Proprietary Information or any portion thereof except at Delk's request. Constrained Party will not disclose any Proprietary Information to any employees, representatives, or agents, except to those employees, representatives, or agents who (a) need to know such information in connection with their work for Disclosing Party or for Constrained Party to perform its services for Disclosing Party or Delk and (b) are bound to Constrained Party by a duty of confidentiality substantially similar to the duty provided herein that protects Proprietary Information of Disclosing Party.

3.     The foregoing shall not apply to Proprietary Information which Constrained Party can show (a) is publicly known through no fault of the Constrained Party, (b) is required to be disclosed pursuant to a judicial, legislative or regulatory order or proceeding; provided that, to the extent permitted by and practical under the circumstances, Constrained Party provides Disclosing Party (i) prior notice of the intended disclosure and an opportunity to respond or object to the disclosure or (ii) if prior notice is not permitted or practical under the circumstances, prompt notice of such disclosure.  Constrained Party shall cooperate with any attempt by Disclosing Party to obtain a protective order or other remedy against disclosure.  In the event that a protective order or other remedy is not obtained, or Disclosing Party waives compliance with the provisions of this Agreement, Constrained Party agrees that it shall furnish only that portion of the Proprietary Information which it is advised in writing by counsel that it is legally required to disclose, and further, Constrained Party shall exercise commercially

reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Proprietary Information which is so disclosed.

4.    Constrained Party will not construe anything in this Agreement as granting or conferring any right by license or otherwise, expressly or impliedly, for any business strategy, marketing plan, development or improvement on any of the foregoing, embodied in the Proprietary Information obtained hereunder.

5.    The Proprietary Information is provided on an "AS IS" basis without representation or warranty of any kind, express, implied or statutory.

6.    If Constrained Party's relationship with Disclosing Party is terminated at any time or Constrained Party  decides not to proceed with a contemplated business relationship with Disclosing Party after closing to Delk, or if asked by Disclosing Party at any time, Constrained Party will promptly return or destroy all Proprietary Information and all copies and extracts. Constrained Party will promptly notify Disclosing Party of any unauthorized release of Proprietary Information.

7.    For a period of one (1) year from the date of the last disclosure of Proprietary Information, the Constrained Party shall not solicit for employment any employee of the Disclosing Party or its subsidiaries or affiliates without the prior written consent of the Disclosing Party or Delk.  Further, Constrained Party is strictly prohibited from making disparaging comments or remarks of any kind to any customer, employee, vendor, supplier or any other person or entity about or in relation to the Disclosing Party, its subsidiaries or affiliates or Delk, and will instead promote the business of Disclosing Party and Delk if any inquiries are presented to Constrained Party from any source.

8.    For a period of two (2) years after the date of full execution of this Agreement, Constrained Parties will not solicit for business any of the current or former customers of the Disclosing Party to engage directly or indirectly in Disclosing Party's Business (as defined below) with said customer.  For purposes of this Section of the Agreement, the term "Disclosing Party's Business" will refer to and mean, the manufacture and sale of plastic identification bands for use in hospitals, veterinary clinics, or other commercial uses.

9.    The parties acknowledge that Proprietary Information is unique and valuable, and that disclosure in breach of this Agreement will result in irreparable harm to Disclosing Party for which monetary damages alone would not be an adequate remedy. Therefore, the parties agree that in the event of a breach or threatened breach of confidentiality by Constrained Party, Disclosing Party shall be entitled to specific performance, restraining order, injunctive relief or other equitable relief as a remedy for any such breach or anticipated breach, and the parties agree that Disclosing Party will not be required to post a bond to enforce this Agreement in any respect. Any such relief shall be in addition to and not in lieu of any appropriate relief in the way of monetary damages. In addition, Disclosing Party will be entitled to collect its attorneys' fees, costs of court, and all expenses of litigation from the Constrained Party in the event litigation becomes necessary to enforce the terms of this Agreement.

10.    The confidentiality obligations of the parties under this Agreement will remain in effect with respect to any particular Proprietary Information for three (3) years from the date of the last disclosure.

11.     This Agreement is governed by the laws of the State of Texas, without regard to conflicts of laws rules or provisions.  With respect to any suit, action or proceeding relating to this Agreement, each party irrevocably submits to the exclusive jurisdiction of the courts of the State of Texas and the United States District Court located in Dallas County, Texas.  Nothing in this Agreement precludes either party from enforcing in any jurisdiction any judgment, order or award obtained in any such court.

12.     This Agreement is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous written and oral agreements and communications with respect to the subject matter of this Agreement.  If any provision is found to be unenforceable, such provision will be limited or deleted to the minimum extent necessary so that the remaining terms continue in full force and effect.  This Agreement may only be amended by the written agreement of both parties.  This Agreement and benefits conferred hereunder to Company will be assignable to Delk upon the Closing of the purchase of the asset purchase from Company.

**Acknowledged and Agreed:**          **Company:**

**Delk Holdings, Inc.**          **Products International Company**

Signature: _____          Signature: _____

Name: _____Bob Delk_____          Name: _____David Birdsell_____

Title: _____President_____          Title: _____Trustee_____

Date: _____          Date: _____

**Constrained Parties:**

**Individually**

Signature: _____          Signature: _____

Name: _____Carl Twentier_____          Name: _____Patricia Twentier_____

Date: _____          Date: _____

Signature: _____

Name: _____Mike Ferring_____

Date: _____